IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| INTERLAND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM B. BUNTING; | ) | |
| STEVE HARTER; and | ) | |
| DOMINIQUE BELLANGER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | CIVIL ACTION FILE |
| WILLIAM B. BUNTING; | ) | |
| STEVE HARTER; and | ) | NO. 1-04-CV-444-ODE |
| DOMINIQUE BELLANGER, | ) | |
| | ) | |
| Counterclaim | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| INTERLAND, INC. | ) | |
| | ) | |
| Counterclaim | ) | |
| Defendant. | ) | |

## PLAINTIFF INTERLAND, INC.'S
## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Interland, Inc. ("Interland") and, by way of its First

Amended Complaint against Defendants William B. Bunting ("Defendant

Bunting"), Steve Harter ("Defendant Harter") and Dominique Bellanger

("Defendant Bellanger") (hereinafter collectively "Defendants"), shows the Court as follows:

## PARTIES

1.

Interland is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Fulton County, Georgia.

2.

Defendants Bunting, Harter and Bellanger (the "Defendant Shareholder Representatives") are the appointed representatives, as set forth in Article X of the Agreement and Plan of Merger dated December 19, 2002 (the "Merger Agreement"), of the stockholders who held stock in Hostcentric, Inc. ("Hostcentric") before Hostcentric was purchased by Interland. A true and correct copy of the Merger Agreement (without the Exhibits and Schedules thereto) is attached hereto as Exhibit "A."

3.

Upon information and belief, Defendant Bunting is a resident of California and may be served with process at One Montgomery Street, 37th Floor, San Francisco, California, 94104. Up until March 13, 2002, Defendant Bunting was a member of the Board of Directors of Hostcentric.

4.

Upon information and belief, Defendant Bellanger is a resident of New York and may be served with process at 12 rue Chauchat, Paris, France 75009.  Up until March 18, 2002, Defendant Bellanger was a member of the Board of Directors of Hostcentric.

5.

Upon information and belief, Defendant Harter is a resident of Texas and may be served with process at Three Riverway, Suite 1430, Houston, Texas, 77056.  Up until March 19, 2002, Defendant Harter was a member of the Board of Directors of Hostcentric.

## JURISDICTION AND VENUE

6.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that (a) there is complete diversity of citizenship between Defendants and Interland, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

7.

This Court has personal jurisdiction over the Defendants pursuant to Article 7.6 of the June 13, 2003 Escrow Agreement entered into by and among Interland

- 3 -

and Defendants (the "Escrow Agreement") wherein Defendants consented expressly to the exercise of personal jurisdiction in the state and federal courts of Georgia. A true and correct copy of the Escrow Agreement is attached hereto as Exhibit "B."

8.

Venue for this action lies in this judicial district and division pursuant to 28 U.S.C. § 1391 and Northern District of Georgia Local Rule 3.1 in that the funds in dispute are located in Fulton County, Georgia, a substantial part of the events or omissions giving rise to Interland's claims occurred in this judicial district, the Defendants are subject to personal jurisdiction in this judicial district and Interland resides in Fulton County, Georgia.

**FACTUAL BACKGROUND**

**Merger Negotiations Between Interland and Hostcentric --
Representations Regarding the Long Island Lease**

9.

At all times relevant hereto, Interland and Hostcentric were in the web hosting business.

- 4 -

10.

In early 2002, Interland and Hostcentric began discussions regarding a potential transaction whereby Interland would acquire all of the outstanding shares of Hostcentric stock and Hostcentric would be merged into Interland.

11.

During this time period and throughout the remainder of 2002, Hostcentric was suffering from severe financial difficulties. Hostcentric's Board of Directors adopted a strategy for selling Hostcentric as a means of addressing its financial problems and salvaging the investments of the Hostcentric shareholders.

12.

On July 2, 2002, as part of the discussions between Interland and Hostcentric regarding a potential acquisition and merger, Hostcentric supplied Interland with an "updated model" which set forth, among other things, an analysis of Hostcentric's "Contingent Liabilities." (See Email from Gregory Upham to Cristobal Salas dated July 2, 2002 (attached hereto as Exhibit "C")). In this "model," Hostcentric represented to Interland that a lease for certain real property located in Farmingdale, New York (the "Long Island Lease" or the "Lease") could be terminated for a payment to the owner of the property (the "Landlord") of $180,000. (Id.)

- 5 -

13.

Hostcentric made these representations to Interland to secure Interland's agreement to a "preliminary valuation" of Hostcentric. That "preliminary valuation" would be used in setting the purchase price to be paid by Interland for Hostcentric's outstanding shares of stock in the merger.

14.

Given Hostcentric's relationship with the Landlord for the Long Island Lease, Interland accepted and relied upon Hostcentric's representations regarding the $180,000 buyout cost for the Long Island Lease. Specifically, Interland included the termination cost of $180,000 for the Long Island Lease, as represented by Hostcentric, in its model for valuing Hostcentric and in setting the purchase price for the outstanding shares of Hostcentric's stock in the merger. The representations made by Hostcentric regarding the Long Island Lease buyout were material to Interland's decisions regarding the valuation of Hostcentric and the purchase price to be paid by Interland for the outstanding shares of Hostcentric's stock. Interland's reliance on the representations of Hostcentric regarding the buyout cost for the Long Island Lease was reasonable under the circumstances.

15.

By August 9, 2002, Interland had presented Hostcentric with a detailed term sheet that reflected the discussions of the parties to date and that set forth the proposed terms and conditions for an acquisition by Interland of all of the outstanding shares of Hostcentric's stock.

16.

On August 9, 2002, Hostcentric's Board of Directors approved the term sheet proposed by Interland and authorized its President and Chief Executive Officer, Gregory McKown ("McKown") as well as its Vice-President and Chief Financial Officer, Gregory Upham ("Upham"), to execute the term sheet. Hostcentric's Board further authorized its officers to "take any and all further actions as they or any of them deem necessary or appropriate in connection with the negotiation of the proposed business combination with Interland."

17.

Although Interland had factored Hostcentric's representations regarding the cost of terminating the Long Island Lease into Interland's valuation model, Interland was still concerned about the impact that the Long Island Lease might have on Hostcentric's value. Given the potential exposure under the terms of the

Lease (which did not expire until 2011), Interland sought repeatedly confirmation

from Hostcentric regarding the expected cost of terminating the Lease.

18.

On September 13, 2002, Interland inquired regarding the "status of the Long

Island facility."  Upham responded to this inquiry by stating:

> We are still trying to sublease the facility.  However, I am not impressed
> with the performance of the local broker that we have in Long Island, so I
> am interviewing some other brokers to put on the project.  **Additionally, we
> plan to go back to the landlord with a buyout offer of around 6 to 8
> months rent and see if we can get them to budge.  Will keep you posted.**

(See Emails between Gregory Upham and Cristobal Salas dated September 13,

2002 (attached hereto as Exhibit "D" (emphasis added)).  Interland immediately

followed up by asking "How much is 6-8 months in dollars?" (Id.)  Upham

responded by stating "Rent is $15k per mth [stet] so around $100k +/-," once again

confirming the prior representations made by Hostcentric that the cost of

terminating the Long Island Lease would be about $180,000.  (Id.)

19.

On October 30, 2002, Interland once again inquired about the status of

Hostcentric's efforts to terminate the Long Island Lease.  Interland emphasized

that it was relying on the $180,000 buyout figure supplied by Hostcentric in

- 8 -

Interland's valuation model.  (See Email from Cristobal Salas to Gregory McKown

and Gregory Upham dated October 30, 2002 (attached hereto as Exhibit "E")).

20.

On October 31, 2002, in an internal e-mail, McKown informed the other

Defendants of the status of the negotiations with Interland.  (See Email from

Gregory McKown dated October 31, 2002 (attached hereto as Exhibit "F")).

Specifically, McKown stated:

> INLD surprised us and has responded with the updated valuation.  They
> have not changed the form or composition of the consideration.  We have
> calculated the stock price as currently stated in the merger agreement to be
> 1.67 per share and they have expressed no interest in changing that metric or
> aligning with the stock's current trading price....
>
> **They WILL require a closing adjustment.**  We have talked with Cris
> Salas and this has not been completely formalized as of yet.  We expect to
> have this information next week.
>
> **The Long Island facility could cause some problems given that their
> model takes into account that we are able to terminate such lease for
> about $180k.  The total exposure could be as high as $1.48m, the
> remaining amount on the lease.**

(Id. (emphasis added)).  Therefore, by at least as early as October 31, 2002, all of

the Defendants were aware that Interland had accepted and relied upon the

representations that Hostcentric was "able to terminate [the Long Island Lease] for

about $180k" in setting a value for Hostcentric and a purchase price to be paid by

Interland for the outstanding shares of Hostcentric stock in the merger.  Moreover,

- 9 -

Defendants were aware that the Long Island Lease "could cause some problems" given Interland's reliance on the $180,000 buyout figure Hostcentric quoted for the Long Island Lease.  (Id.).

21.

On December 11, 2002, in another internal e-mail, McKown once again updated Defendants regarding the status of the negotiations with Interland.  (See Email from Gregory McKown dated December 11, 2002 (attached hereto as Exhibit "G")).  Specifically, McKown stated:

> **Hostcentric escrow will be responsible for any costs above 180k to exit the Long Island lease.  We expect this number to be approximately 500k.**

(Id.) (emphasis added).  Therefore, as early as December 11, 2002, all of the Defendants were aware that it would cost substantially more that $180,000 and potentially as much as $500,000 to terminate the Long Island Lease.  Despite the ongoing discussions with Interland, Defendants did not inform Interland of these facts.

**Behind the Scenes--Defendants' Actual Negotiations with the Landlord**

22.

Behind the scenes, Hostcentric was discussing an entirely different amount —far in excess of $180,000—with the Landlord to terminate the Long Island Lease.  Hostcentric did not disclose such discussions to Interland.

23.

On November 14, 2002, Hostcentric's outside legal counsel, David Simpson, made a formal written offer, on Hostcentric's behalf, to terminate the Long Island Lease for $220,000.  (See Letter from David Simpson to Donald Miller dated November 14, 2002 (attached hereto as Exhibit "H")).  Hostcentric was aware of and approved this $220,000 offer prior to the time it was made.  Despite ongoing discussions between Interland and Hostcentric, Defendants did not inform Interland of this $220,000 offer or the Landlord's rejection of this offer.

24.

On or about November 22, 2002, David Simpson spoke with the Landlord and was informed that the Landlord thought the $220,000 offer was "silly."

25.

On or about November 22, 2002, David Simpson advised Hostcentric, in writing, that Hostcentric needed to offer "around $600,000.00 to get a serious response" from the Landlord. (See Email from David Simpson to David Brown dated November 22, 2002 (attached hereto as Exhibit "I")). Despite ongoing discussions between Interland and Hostcentric, Defendants did not inform Interland that an offer of "around $600,000.00" would be required "to get a serious response" from the Landlord.

26.

On or about December 5, 2002, Upham was "supportive of making a recommendation to the Board of Directors of Hostcentric that Hostcentric make a cash payment of $500,000 to terminate the Long Island Lease." (See Declaration of David Simpson dated April 8, 2004 (attached as Exhibit "4" to Interland's Memorandum of Law in Opposition to Defendant's Motion for Preliminary Injunction and Specific Performance).

27.

On or about December 5, 2002, David Simpson sent another letter to the Landlord which stated "my client is prepared to bump up its offer to $500,000, subject to Board Approval. A Board Meeting is scheduled for next week." (See

Letter from David Simpson to Donald Miller dated December 5, 2002 (attached hereto as Exhibit "J")). Hostcentric was aware of and approved this $500,000 proposal prior to the time it was sent to the Landlord. Despite ongoing discussions between Interland and Hostcentric, Defendants never informed Interland of this $500,000 proposal or the response of the Landlord.

28.

On February 3, 2003, David Simpson advised Hostcentric that, based on his discussions with the Landlord, the Long Island Lease could be terminated for a payment "between $500,000.00 and $750,000.00." (See Letter from David Simpson to David Brown dated February 3, 2003 (attached hereto as Exhibit "K")). Defendants never informed Interland of these facts.

29.

During the six month period between December 5, 2002 and June 9, 2003 prior to the closing of the merger, Hostcentric made no further offers, proposals or other efforts to terminate the Long Island Lease.

30.

Hostcentric failed to "keep [Interland] posted," as previously promised by Hostcentric, regarding the foregoing developments in the negotiations with the Landlord and the substantial increase in the expected cost for terminating the Long

- 13 -

Island Lease. (See Emails between Gregory Upham and Cristobal Salas dated September 13, 2002 (attached hereto as Exhibit "D")). Hostcentric waited until the eve of the Closing on the Merger Agreement to inform Interland that the expected buyout cost for the Long Island Lease had skyrocketed from $180,000 to—at a minimum—an amount between $500,000 and $600,000.

### The Merger Agreement and the True Intent of the Parties

31.

On December 19, 2002, the parties executed the Merger Agreement.

32.

The terms of the Merger Agreement specifically referenced and incorporated a figure of "$180,000," as previously represented by Hostcentric, in connection with the termination of the Long Island Lease. (Merger Agreement at §§ 2.4(a) and 8.2(a)).

33.

Specifically, the Merger Agreement provided that:

If Hostcentric terminates the Long Island Lease prior to Closing for a cash payment of less than $180,000, the difference between such amount and $180,000 shall be paid at Closing to the Stockholders' Representatives . . . **If Hostcentric terminates the Long Island Lease prior to or subsequent to Closing for a cash payment of more than $180,000, the difference between such amount and $180,000 shall be paid by the Surviving Corporation and shall constitute a claim against the Escrow Fund,**

**subject to the right of Interland and Merger Sub to seek
indemnification with respect thereto as set forth in Article VIII.**

(Merger Agreement at § 2.4(a) (emphasis added)).

34.

The Merger Agreement also provides that:

[T]he Hostcentric Stockholders, severally and not jointly, hereby agree to
defend, indemnify and hold Interland harmless from and against, and to
reimburse Interland with respect to, any and all losses, damages, liabilities,
claims, judgments, settlements, fines, out-of-pocket costs and expenses
(including reasonable attorneys' fees and expenses actually paid)
("Indemnifiable Amounts") of every nature whatsoever incurred by
Interland (which will be deemed to include any of the foregoing incurred by
the Surviving Corporation) by reason of or arising out of or in connection
with the following...

**any obligation of Interland or the Surviving Corporation to pay a
cash payment to terminate the Long Island Lease in excess of
$180,000 or to pay closing costs for Hostcentric in excess of
$300,000 pursuant to Sections 2.4(a) and (b) respectively;**

(Merger Agreement at § 8.2(a) (emphasis added)).

35.

The true intent of the parties, as reflected in the Merger Agreement and in

the negotiations leading up to the execution of same, was that Hostcentric and the

pre-merger shareholders of Hostcentric (defined in the Merger Agreement as the

"Hostcentric Stockholders") – **not Interland** – would be responsible for any risk

of loss in connection with the termination of the Long Island Lease in excess of $180,000. (Merger Agreement §§ 2.4(a), 8.2(a), 8.2(e)).

### Hostcentric's Failure to Exercise Best Efforts to Terminate the Long Island Lease

36.

On December 19, 2002, Hostcentric covenanted in the Merger Agreement that "it [would] use commercially reasonable best efforts to terminate the [Long Island Lease] prior to Closing." (Merger Agreement at § 2.4(a)). Hostcentric failed, however, to make good on this promise.

37.

During the six month period between December 5, 2002 and June 9, 2003, Hostcentric made no offers, proposals or other efforts to terminate the Long Island Lease.

38.

In fact, after Hostcentric was advised by its outside counsel on February 3, 2002 that it would take an offer of "around $600,000 to get a serious response" from the Landlord regarding termination of the Long Island Lease, Hostcentric made an affirmative decision to cease any efforts to terminate the Long Island Lease until it was certain that the parties would close on the Merger Agreement.

(<u>See</u> Email from Gregory McKown to Gregory Upham dated November 26, 2002

(attached hereto as Exhibit "L")).

39.

For example, in response to the advice provided by Hostcentric's outside

counsel which indicated that an offer of $600,000 was necessary to engage the

Landlord in serious negotiations, McKown stated:

> Well we certainly would not settle for that amount [$600,000] at this time,
> without being certain of a [Merger Agreement] close.  We do need to know
> what the final number is; however.

(<u>See</u> Email from Gregory McKown to Gregory Upham dated November 26, 2002

(attached hereto as Exhibit "L")).

40.

In addition, Upham confirmed in an email sent to McKown on February 4,

2003 that:

> [T]he last time we all pow-wowed on the [Long Island] issue was mid-
> January and we decided to revisit the issue in early February as to whether
> or not we were ready to pull the trigger on a buyout offer to Warthog [the
> Landlord].  Here we are in early February and my vote is to continue to sit
> on it for a couple more weeks.

(<u>See</u> Email from Gregory Upham to Gregory McKown dated February 4, 2003

(attached hereto as Exhibit "M")).

41.

Finally, on June 4, 2003, McKown sent an email to Hostcentric's outside counsel responsible for negotiating the Merger Agreement, William Gutermuth, and inquired as to whether he should "call a board meeting to authorize a 500k offer [to terminate the Long Island Lease] prior to close." (See Email from Gregory McKown to William Gutermuth dated June 4, 2003 (attached hereto as Exhibit "N")).  McKown further stated that "We would not make such an offer were the deal not to close." (Id.).

42.

**In fact, Hostcentric did not make a single offer or proposal to terminate the Long Island Lease from the date the Merger Agreement was executed on December 19, 2002 until June 9, 2003 – just four (4) days before the parties closed on the Merger Agreement.**  Hostcentric's conduct constitutes a complete, material and intentional failure to comply with the covenant to use "commercially reasonable best efforts to terminate the [Long Island Lease] prior to Closing." (Merger Agreement at § 2.4(a)).

43.

Hostcentric and Interland closed on the Merger Agreement on June 13, 2003.  Hostcentric waited until the eve of the Closing on the Merger Agreement to

inform Interland that the expected buyout cost for the Long Island Lease had

skyrocketed from $180,000 to—at a minimum—an amount between $500,000 and

$600,000.  Hostcentric concealed affirmatively these facts from Interland up until

the eve of the Closing.  Further, Hostcentric failed to terminate the Long Island

Lease prior to Closing.

### Defendants' Post-Merger Efforts to Terminate the Long Island Lease

44.

Following the Closing on the Merger Agreement on June 13, 2002,

Defendants willingly accepted the responsibility for terminating the Long Island

Lease and liquidating any "obligation of Interland or the Surviving Corporation to

pay a cash payment to terminate the Long Island Lease . . ."  (See Merger

Agreement at § 8.2(a)(iv)).

45.

On June 4, 2003, Interland's outside counsel for purposes of the merger and

acquisition, Sherman Cohen, informed Hostcentric that Interland was willing to

allow Upham "or other Hostcentric representatives to enter into final negotiations

to terminate the Hostcentric lease of a facility in Farmingdale, New York."  (See

Email from Sherman Cohen to Gregory Upham dated June 4, 2003 (attached

hereto as Exhibit "O")).  Upham and McKown responded to this invitation by

forwarding Mr. Cohen's message to Hostcentric's counsel, William Gutermuth, and inquiring "Is this sufficient direction for us to call a board meeting to authorize a 500K offer prior to close.  We would not make such an offer were the deal not to close.  I doubt it would actually be papered by end of next week."  (See Email from Gregory McKown to William Gutermuth dated June 4, 2003 (attached hereto as Exhibit "N")).  Five days later, Hostcentric made such an offer to the Landlord. (See Letter from David Simpson to Donald Miller dated June 9, 2003 (attached hereto as Exhibit "P")).

46.

In addition, Defendants acknowledged repeatedly that it was their responsibility to terminate the Long Island Lease post-Closing and liquidating any "obligation of Interland or the Surviving Corporation to pay a cash payment to terminate the Long Island Lease . . ."  (See Merger Agreement at § 8.2(a)(iv)).  For example, on August 27, 2003, in response to an email from Hostcentric's outside counsel to David Brown and Upham, Mr. Brown asked "When does our right to handle this negotiation run out?  When does Inld have the right to take over?"  (See Email from David Brown ("Brown") to David Simpson dated August 27, 2003 (attached hereto as Exhibit "Q").  Upham responded by stating:

> **There is no formal binding start and stop as to when we bow out of the process.  We should continue pushing until someone tells us otherwise.**

> **Technically, we (i.e. stockholders reps) have until the escrow period terminates [December 13, 2003] to resolve it.**
>
> **I am keeping Sherman Cohen [Interland's outside counsel] abreast of the situation so he knows that we are waiting on the landlord to complete their refinancing.**

(See Email from Gregory Upham to David Brown dated August 27, 2003 (attached hereto as Exhibit "R" (emphasis added)).

47.

Similarly, on November 6, 2003, Brown sent an email to Defendant Bunting and Defendant Harter, copying McKown and Upham, which stated:

> Given my status as both a shareholder of Hostcentric and an Interland employee, I am discontinuing any participation in the proposed negotiation of a settlement with the landlord for the Long Island Hostcentric lease effective immediately. This matter has been handled by outside counsel David Simpson beginning before the acquisition and continuing through today. I have attached Mr. Simpson's vcard to this email if you should require his contact information.

(See Emails from David Brown dated November 6, 2003 (attached hereto as Exhibit "S")). In response, Upham once again confirmed that Defendants had undertaken all responsibility for terminating the Long Island Lease and liquidating the buyout cost. Specifically, Upham responded to David Brown by stating:

> It's not your responsibility any way, so it should go to those you addressed [Defendants Bunting and Harter] regardless.

(See Email from Gregory McKown to David Brown dated November 7, 2003

(attached hereto as Exhibit ("T")).

48.

During the fall of 2003 after the close of the merger, Interland was informed

on several occasions by Defendant Bunting that the former Hostcentric

Stockholders were continuing to work on the termination of the Long Island Lease.

In fact, on several occasions, Interland confirmed this understanding in writing to

Defendant Bunting.  For example, in correspondence dated November 19, 2003,

Interland stated to Defendant Bunting:

> [y]ou have advised Interland, in recent telephone conversations that the
> former Hostcentric Stockholders are continuing to work on the termination
> of the Long Island Lease but that it has not yet been terminated.  **Interland
> appreciates your assurances and is willing to continue to work with you
> in a cooperative manner to facilitate the termination of the Long Island
> Lease**.

(See Letter from Jonathan Wilson dated November 19, 2003 (attached hereto as

Exhibit "U") at 2 (emphasis added))

49.

Despite the fact that Defendants undertook the responsibility for terminating

the Long Island Lease post-Closing, Defendants failed to secure such a

termination.  Defendants' failure to terminate the Long Island Lease rendered it

impossible for Interland to ascertain a definitive and liquidated amount for any

- 22 -

"obligation of Interland or the Surviving Corporation to pay a cash payment to terminate the Long Island Lease . . ." (See Merger Agreement at § 8.2(a)(iv)).

## COUNT I

## DECLARATORY JUDGMENT

### (Indemnification From the Escrowed Funds for Breach of Covenant to Exercise Best Efforts)

50.

Interland hereby incorporates Paragraphs 1 through 49 above of this First Amended Complaint as if fully restated and set forth herein.

51.

Hostcentric materially breached its covenant to use "commercially reasonable best efforts to terminate the [Long Island Lease] prior to Closing." (Merger Agreement at § 2.4(a)). Moreover, by concealing facts from Interland and by affirmatively misleading Interland regarding the status of the negotiations with the Landlord for the termination of the Long Island Lease, Hostcentric acted in bad faith and breached the covenant of good faith and fair dealing implied in the Merger Agreement.

52.

As a direct and proximate result of Hostcentric's breach of these covenants, Interland has suffered damages and been forced to incur out of pocket costs and expenses (including reasonable attorneys' fees and expenses actually paid) referred to in the Merger Agreement as "Indemnifiable Amounts." (See Merger Agreement at § 8.2(a)(i) and (ii)). These Indemnifiable Amounts include: (a) rent paid by Interland on the Long Island Lease since the Closing; (b) attorneys' fees and other expenses incurred in connection with litigation against the Landlord for the Long Island Lease; (c) attorneys' fees and other expenses incurred in connection with this litigation; and (d) any costs and expenses incurred by Interland in terminating the Long Island Lease.

53.

These Indemnifiable Amounts also include any damages or losses suffered by Interland as a result of the delay in terminating the Long Island Lease caused by Hostcentric's failure to use commercially reasonable best efforts to terminate the Lease prior to Closing. Specifically, Interland's stock price has declined since the time period when Hostcentric was required to use its best efforts to terminate the Long Island Lease. This drop in stock price has directly and negatively impacted the application of the formula contained in the Escrow Agreement for valuing

Buyer Claims and exacerbated Interland's losses and damages.  Interland is entitled to recover for any such losses or damages resulting from the delay in termination of the Long Island Lease caused by Hostcentric's breach of the covenants contained in the Merger Agreement.

54.

Interland is entitled to be indemnified by Hostcentric's Stockholders, in full, for the Indemnifiable Amounts suffered or incurred by Interland.

55.

In accordance with Articles 2.2, 8.1 and 8.2 of the Merger Agreement, Interland deposited a portion of the purchase price into an Escrow Fund as security for, among other things, any obligation of the Hostcentric Stockholders to indemnify and hold Interland harmless from and against any losses arising out of "any breach or any claim that constitutes a breach of any covenant or agreement of Hostcentric contained in this Agreement" and "reasonable costs or expenses which may be incurred by Interland, Merger Sub or any affiliate thereof in curing any breach of covenant."  (Merger Agreement at §§ 8.2(a)(i), (ii) and (iv)).

56.

Defendants and Interland entered into the Escrow Agreement to govern the management and release of the Escrowed Funds.

57.

On November 19, 2003, Interland sent its Notice of Buyer Claim to the Escrow Agent and the Shareholders' Representatives. (See Exhibit U). This Notice of Buyer Claim formally put the parties on notice of Interland's claim for indemnification resulting from Hostcentric's breach of the covenant to "use commercially reasonable best efforts to terminate the lease agreement … prior to Closing." (Id. at 2).

58.

Under the Merger Agreement and the Escrow Agreement, Interland is entitled to hold in the Escrowed Funds cash and stock sufficient to reimburse Interland for the Indemnifiable Amounts suffered or incurred by Interland as a result of Hostcentric's breach of the best efforts covenant and the covenant of good faith and fair dealing contained in the Merger Agreement.

59.

As a result of the foregoing, an actual case or controversy exists regarding the amount Interland is entitled to hold back in the Escrowed Funds pursuant to the Merger Agreement and the Escrow Agreement.

60.

As a result of the foregoing, Interland is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Interland is entitled to all Indemnifiable Amounts, plus prejudgment interest thereon, that Interland has or will suffer or incur as a result of Hostcentric's breach of its covenant to use commercially reasonable best efforts to terminate the Long Island Lease prior to Closing and Hostcentric's breach of the implied covenant of good faith and fair dealing.

## COUNT II

## DECLARATORY JUDGMENT

### (Indemnification From the Escrowed Funds for
### Cost of Terminating the Long Island Lease)

61.

Interland hereby incorporates Paragraphs 1 through 60 above of this First

Amended Complaint as if fully restated and set forth herein.

62.

In accordance with Articles 2.2, 8.1 and 8.2 of the Merger Agreement,

Interland deposited a portion of the purchase price into Escrowed Funds as security

for, among other things, any obligation of Interland to pay a cash payment to

terminate the Long Island Lease in excess of $180,000.  (Merger Agreement at §§

8.2(a)(i), (ii) and (iv)).

63.

To date, Hostcentric and Defendants have never terminated the Long Island

Lease.

64.

On or about December 12, 2003, Interland contacted the Landlord and

terminated the Long Island Lease.

65.

The Landlord informed Interland, in a letter dated February 3, 2004, that an

obligation in the amount of $2,014,245.76 remained under the Long Island Lease.

(See Letter from Landlord to Interland dated February 3, 2004 (attached hereto as

Exhibit "V")).

66.

Defendants object to Interland paying, out of the Escrowed Funds, the

Landlord the $2,014,245.76 that has been demanded.

67.

The Landlord has expressed its intent to hold Interland liable for the balance

due under the Long Island Lease.

68.

Defendant Shareholder Representatives have demanded that all of the

Escrowed Funds be released and paid to Defendants.

69.

On November 19, 2003, Interland sent its Notice of Buyer Claim to the

Escrow Agent and the Shareholders' Representatives.  (See Letter from Jonathan

Wilson dated November 19, 2003 (attached hereto as Exhibit "U")).  This Notice

of Buyer Claim formally put the parties on notice of Interland's claim for

indemnification for any liability it may incur as a result of the termination of the Long Island Lease.  (Id. at 2).

70.

Under the Merger Agreement and the Escrow Agreement, Interland is entitled to hold in the Escrowed Funds cash and stock sufficient to reimburse Interland for any liability it may incur as a result of the termination of the Long Island Lease.

71.

As a result of the foregoing, an actual case or controversy exists regarding the amount due under the Long Island Lease and the amount Interland is entitled to hold back in the Escrowed Funds pursuant to the Merger Agreement and the Escrow Agreement.

72.

As a result of the foregoing, Interland respectfully requests that a declaratory judgment be entered pursuant to 28 U.S.C. § 2201 declaring that:

(1)     Interland is entitled to recover the monies it may pay to terminate the Long Island Lease from the Escrowed Funds; and

(2)     The cash and stock in the Escrowed Funds should not be released until the Long Island Lease is terminated.

- 30 -

WHEREFORE, Plaintiff Interland demands judgment in its favor and against Defendant as follows:

A.    A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that:

    (1)    Interland is entitled to all Indemnifiable Amounts, plus prejudgment interest thereon, that Interland has or will suffer or incur as a result of Hostcentric's breach of its covenant to use commercially reasonable best efforts to terminate the Long Island Lease prior to Closing and Hostcentric's breach of the implied covenant of good faith and fair dealing;

    (2)    Interland is entitled to recover all amounts it may pay to terminate the Long Island Lease from the Escrowed Funds, plus prejudgment interest thereon; and

    (3)    The cash and stock in the Escrowed Funds should not be released until the Long Island Lease is terminated;

B.    An Order awarding Interland its expenses incurred in this litigation including, but not limited to, reasonable attorneys' fees; and

C.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

Interland, Inc. hereby demands a jury trial on all of the issues in this case.

Respectfully submitted, this 21st day of May, 2004.

JOSEPH D. WARGO
Georgia Bar No. 738764
JEANINE L. GIBBS
Georgia Bar No. 292590

Attorneys for Plaintiff Interland, Inc.

WARGO & FRENCH LLP
1170 Peachtree Street, N.E.
Suite 2020
Atlanta, Georgia 30309
(404) 853-1500
(404) 853-1501 (facsimile)